

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **BO KYOUNG KIM** | § | Case No. 12-40813 |
| xxx-xx-7943 | § | |
| | § | |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| SOK SAN PAK and | § | |
| SOO KYOUNG PAK | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | Adversary No. 12-4101 |
| | § | |
| BO KYOUNG KIM | § | |
| | § | |
| Defendant | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

Upon trial of the complaint in the above-referenced adversary proceeding, the

Court issues the following findings of fact and conclusions of law pursuant to Fed. R.

Civ. P. 52, as incorporated into adversary proceedings in bankruptcy cases by Fed. R.

Bankr. P. 7052.

### *FINDINGS OF FACT*

1.    The complaint seeks a determination of the dischargeability of the debt owing by
      the Debtor-Defendant, Bo Kyoung Kim ("Defendant"), to the Plaintiffs, Sok San
      Pak and Soo Kyoung Pak ("Plaintiffs").

---

[1]  These findings of fact and conclusions of law are not designated for publication and shall not
considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the
law of the case or as to other applicable evidentiary doctrines.

2.     Plaintiff, Sok San Pak ("Mr. Pak") and the Defendant, Bo Kyoung Kim, were the sole shareholders in S.S.P. C-Store, Inc. ("SSP Corp.").[2]

3.     Of the one thousand issued and outstanding shares of SSP Corp., Mr. Pak owned 490 shares (49%) and the Defendant owned 510 shares (51%).[3]

4.     Mr. Pak served as president of SSP Corp.

5.     There were never any shareholder meetings.  There were never any board of directors meetings.

6.     In fact, despite their respective ownership of all of the SSP Corp. stock, Mr. Pak and the Defendant never had any interaction regarding the business activities of SSP Corp. or the eventual sale of its assets.

7.     Prior to March 20, 2008, SSP Corp. owned and operated a gas station and convenience store under its assumed name, Speedy Food Mart, located at 7410 Highway 78 in Sachse, Collin County, Texas, and a beer and wine store under its assumed name, Speedy Beverage, located at 7340 Highway 78 in Sachse, Collin County, Texas (collectively, the "Sachse Store").[4]

8.     Neither Mr. Pak nor the Defendant was involved in the daily operations of the Sachse Store.

9.     Daily operations of the Sachse Store were supervised by the Defendant's husband, Sang Jun (John) Park ("John Park").

10.    Indeed, in virtually every way germane to this dispute, the Defendant deferred to the direction and/or activities of her husband, John Park, in the exercise of her rights as an officer and shareholder of SSP Corp.

11.    Similarly, as to the events involved in this dispute at which time he was 69 years of age, Mr. Pak utilized the services of, his son, Mike Pak, in the exercise of his

---

[2]   See the allegation contained in ¶ 2.1 of the Plaintiffs' Amended Complaint which was subsequently admitted in the Defendant's Amended Answer [dkt #15].  Subsequent pleading admissions of the Debtor-Defendant are hereafter referenced in these footnotes as "Admitted ¶ x."

[3]   *Id*.

[4]   Admitted ¶ 2.2 and 2.3.  The other Plaintiff, Soo Kyoung Pak, had no involvement with SSP Corp.

rights as an officer and shareholder of SSP Corp.

12.    In 2007, John Park expressed to Mike Pak that the Defendant desired to sell the Sachse Store.

13.    All discussions and the ultimate agreement by shareholders to sell the Sachse Store were conducted by and between John Park, on behalf of his wife, and Mike Pak, on behalf of his father.

14.    The Defendant never had any discussion with either Mike Pak or Mr. Pak regarding any aspect of the sale of the Sachse Store.

15.    The parties proceeded through a sales process and the parties eventually accepted an offer in March 2008 from Jason and Sai Corp. in the amount of $2,500,000.00 plus the cost value of the Sachse Store inventory for the sale of the Sachse Store.[5]

16.    The sale was facilitated through Federal Title, Inc.

17.    The projected net sales proceeds approximated $400,000.00.

18.    Notwithstanding the fact that she owned only 51% of the SSP Corp. stock, the Defendant and her husband sought to obtain all of the net sales proceeds from the sale of the Sachse Store.

19.    When Federal Title contacted Mike Pak to confirm his father's permission to tender all net sales proceeds to the Defendant, Mike Pak, at the direction of his father, disputed the existence of any such authority and instructed the escrow company to hold the net sales proceeds.

20.    John Park then contacted Mike Pak and represented to him that he and the Defendant needed access to the entirety of the funds for only a few days to assist in the renewal of an E-2 visa and Park further represented that Mr. Pak would receive his 49% proportionate share of the net sales proceeds at the conclusion of that process.

21.    John Park further represented that he and his wife would tender to Mr. Pak the sum of $75,000, to serve as an inducement for Mr. Pak to sign the necessary paperwork with the escrow company to assign all of the net sales proceeds to the Defendant

---

[5]  Admitted ¶ 2.6.

on a temporary basis and as a good faith deposit toward the fulfillment of their joint promise to Mr. Pak to tender subsequently his proportionate share of the net sales proceeds.

22.   Mr. Pak agreed, upon receipt of the $75,000 from the Defendant and her husband, to sign the proper forms with the escrow company to authorize the payment of all of the net sales proceeds to the Defendant.

23.   A check was drawn on the Defendant's personal bank account at Wells Fargo Bank on March 25, 2008, in the amount of $75,000, made payable to Mike Pak.[6]

24.   The Defendant testified in that regard that she signed a blank check on her personal bank account at the direction of her husband, gave it to her husband, and her husband completed the preparation of the check to Mike Pak without her assistance or input.

25.   John Park, on behalf of the Defendant, delivered the $75,000 check to Mike Pak.

26.   Upon his son's receipt of the $75,000 check, Mr. Pak signed the authorization forms for the escrow company to tender all of the net sales proceeds to the Defendant.[7]

27.   Federal Title subsequently tendered $396,907.58 in net sales proceeds to the Defendant arising from the sale of the Sachse Store.

28.   Upon receipt of all of the net sales proceeds, the Defendant, following the instructions of her husband, John Park, went to Wells Fargo Bank and processed a "stop payment" order regarding the $75,000 check.[8]

29.   When Mike Pak subsequently presented the $75,000 check at the Defendant's bank for payment, he was informed that there were no longer funds in the Defendant's bank account from which the payment could be made and Wells Fargo Bank refused to honor the check.

30.   John Park subsequently refused Mike Pak's telephone calls.  When Mike Pak

---

[6]  Plaintiffs' Ex. B.

[7]  Defendant's Ex. 2 at p. 2.

[8]  *Id.*

appeared at the home of Park and the Defendant regarding the matter three or four days later, John Park summoned the police.

31.   The Defendant never tendered any money to Mr. Pak for his proportional share of the net sales proceeds.

32.   Prior to the sale of the Sachse Store, the parties were contemplating the purchase of land near Prosper in order to develop a new convenience store operation.

33.   Kim & Pak Corporation was formed in or about January 2008 for the purpose of pursuing the Prosper business opportunity.

34.   Ownership of the 10,000 outstanding shares of Kim & Pak Corp. was divided in the following way:  6,000 shares (60%) for the Defendant; 2,000 shares (20%) for Mr. Pak; and 2,000 shares (20%) for Mr. Pak's daughter-in-law, and Plaintiff, Soo-Kyoung Pak, the wife of Mike Pak.[9]

35.   Mr. Pak was elected president of Kim & Pak Corp.[10]

36.   The Defendant was elected secretary of Kim & Pak Corp.[11]

37.   Despite the fact that a loan application was submitted to Cathay Bank for the purpose of obtaining funds for land acquisition for the Prosper opportunity, the diversion of the Sachse Store sales proceeds precluded the successful conclusion of that process.

38.   No land was ever acquired in Prosper by Kim & Pak Corp.

39.   The Plaintiffs initiated litigation against the Defendant and John Park in 2008 before the 416th Judicial District Court in and for Collin County, Texas, in cause no. 416-00730-2008 (the "State Court Litigation").

40.   The State Court Litigation was tried to a jury.

---

[9]   Admitted ¶ 2.27.

[10]  *Id.*

[11]  *Id.*

41.    Based upon jury findings,[12] the State Court Litigation resulted in the entry of a judgment in favor of Mr. Pak against the Defendant and her husband, John Park (the "State Court Judgment").[13]

42.    The State Court Judgment specified certain categories of damages awarded to Mr. Pak, and against the Defendant (and her husband), as follows:

   (a)    $37,500:   "for failing to comply with the SSPC Store, Inc. post-sale expenses;"[14]

   (b)    $37,500:  "for failing to comply with the agreement of paying $75,000;"

   (c)    $103,407.36:  "for committing fraud;"

   (d)    $310,222.08:  "for exemplary damages by committing fraud;"

   together with 10% pre-judgment interest on all such amounts from March 20, 2008 to the date of judgment [*November 15, 2011*]; and with post-judgment interest on all such amounts at 10%.[15]

43.    The State Court, "after examining the file and the evidence" further determined that Mr. Pak had incurred reasonable and necessary attorney's fees in the prosecution of State Court Litigation and ordered the Defendant and her husband to pay to Mr. Pak reasonable and necessary attorney's fees in the amount of $50,000.00 pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.[16]

44.    The Debtor-Defendant filed a voluntary petition for relief under Chapter 7 of the

---

[12]  Such jury findings could have likely expanded the use of the principles of collateral estoppel with regard to many of the specific factual disputes in this adversary proceeding; however, the Plaintiffs failed to submit the jury findings to this Court.  Thus, the only settled facts binding upon this Court are those evident from the State Court Judgment, including the various components of the liquidated debt owing by the Defendant to Sok San Pak.

[13]  Plaintiffs' Ex. A.

[14]  This issue was not presented to this Court.

[15]  Plaintiffs' Ex. A.

[16]  Plaintiffs' Ex. A.

Bankruptcy Code on March 30, 2012.[17]

45.   The State Court Judgment was on appeal at the time of the bankruptcy filing,[18] but there is no evidence that the Judgment has been superseded during the pendency of that appeal.

46.   The Plaintiffs timely filed their complaint for determination of the dischargeability of the debt owed to them on June 22, 2012.

47.   The Plaintiffs contend that their claims are non-dischargeable as a debt obtained by false pretenses, a false representation or actual fraud under 11 U.S.C. §523(a)(2)(A) or, alternatively, as a defalcation by a fiduciary under 11 U.S.C. §523(a)(4).

*Claims by Plaintiff, Soo Kyoung Pak*

48.   Plaintiff, Soo Kyoung Pak, has failed to demonstrate by a preponderance of the evidence that any debt is owed to her by the Defendant.

49.   Plaintiff, Soo Kyoung Pak, has failed to demonstrate by a preponderance of the evidence that any debt owed to her by the Defendant was procured under circumstances constituting actual fraud.

50.   Plaintiff, Soo Kyoung Pak, has failed to demonstrate by a preponderance of the evidence that the Defendant or her agent made false representations to her.

51.   Plaintiff, Soo Kyoung Pak, has failed to demonstrate by a preponderance of the evidence that she justifiably relied upon any false representations by the Defendant or by her agent for which the Defendant is legally responsible.

52.   Plaintiff, Soo Kyoung Pak, has failed to demonstrate by a preponderance of the evidence that the Defendant acted in a fiduciary capacity as to her at any time.

53.   Plaintiff, Soo Kyoung Pak, has failed to demonstrate by a preponderance of the evidence that a trust relationship existed between the Defendant and herself prior to the creation of any indebtedness between the parties.

---

[17]   ¶ E(1) of the Stipulated Statements of Fact set forth in the approved Joint Pre-Trial Order entered in this adversary proceeding on August 16, 2013 [dkt #19].

[18]   ¶ E(4) of the Stipulated Statements of Fact.  See Defendant's Ex. 2.

*Claims by Plaintiff, Sok San Pak*

54. With regard to all of his actions and decisions pertaining to the sale of the Sachse Store by SSP Corp., John Park acted as an agent of the Defendant, Bo Kyoung Kim, in her individual capacity and as majority shareholder of SSP Corp.

55. With regard to his actions and decision pertaining to the sale of the Sachse Store by SSP Corp., Mike Pak acted as an agent for his father, the Plaintiff, Mr. Pak, in his individual capacity and as minority shareholder of SSP Corp.

56. John Park represented to Mike Pak that his father, Mr. Pak, would receive his 49% proportionate share of the net proceeds arising from the sale of the Sachse Store when the visa renewal process was completed.

57. John Park represented to Mike Pak that the Defendant would pay the sum of $75,000 to Mr. Pak to induce him to sign the paperwork necessary to authorize the escrow company to pay to the Defendant all of the net proceeds arising from the sale of the Sachse Store.

58. John Park represented to Mike Pak that the Defendant would pay the sum of $75,000 as a partial payment and good faith deposit toward the fulfillment of the legal obligation to tender to Mr. Pak his proportionate share of the net proceeds arising from the sale of the Sachse Store.

59. John Park represented to Mike Pak that the Defendant's retention of Mr. Pak's proportionate share of the net proceeds arising from the sale of the Sachse Store, less the tendered $75,000, would only be temporary in nature.

60. John Park knew that the foregoing representations to the agent of Mr. Pak, including the payment of the $75,000 and the temporary nature of the Defendant's retention of Mr. Pak's proportionate share of the net sales proceeds, were false when they were made.

61. John Park made the foregoing false representations to the agent of Mr. Pak with the intention of deceiving him.

62. In the absence of the false representations, the Defendant was not otherwise entitled to receive, nor would she have received, possession of all of the net proceeds arising from the sale of the Sachse Store.

63. In the absence of the false representations, Mr. Pak would not have relinquished

control over his proportionate share of the net proceeds arising from the sale of the Sachse Store to the Defendant.

64.     Mr. Pak, by and through his agent, Mike Pak, thus actually and justifiably relied upon the false representations of John Park.

65.     Mr. Pak suffered financial losses as a direct and proximate cause of that reliance, in the amount of $103,407.36, as reflected in the State Court Judgment.[19]

66.     The overwhelming weight of the evidence indicates the existence of an agency relationship between the Defendant and her husband, John Park, under both express and implied agency principles.

67.     The Defendant knowingly permitted her husband, John Park, to act on her behalf with third parties in all relevant aspects of her ownership of SSP Corp., including actual store operations.

68.     The Defendant knowingly permitted her husband, John Park, to hold himself out to third parties, including Mr. Pak, as having full authority to act on behalf of the Defendant with regard to her ownership of SSP Corp. stock and the operation of the Sachse Store.

69.     John Park served as the Defendant's exclusive contact person for all issues pertaining to her individual ownership of SSP Corp. stock and the operation of the Sachse Store.

70.     The Defendant knowingly permitted her husband, John Park, to act exclusively on her behalf to superintend the sale of the Sachse Store.

71.     The Defendant knowingly permitted her husband, John Park, to act on her behalf to solicit the cooperation and assistance of the minority stockholder, Mr. Pak, in the sale of the Sachse Store, including the disposition of sale proceeds.

72.     The Defendant knowingly permitted her husband, John Park, to serve as the sole intermediary to handle all communications to all third parties regarding the sale of

---

[19]   The Court has omitted from the damage calculation the sums set forth in ¶¶ 1 and 2 of the State Court Judgment, respectively, since liability for "failing to comply with paying ... post-sale expenses" and for "failing to comply with the agreement" does not clearly evidence a finding of fraudulent conduct and the Plaintiffs failed to tender any state court factual finding, transcript, or other evidence to support the non-dischargeability of either of those portions of the State Court Judgment.

the Sachse Store, including those with Federal Title and with Mr. Pak's representatives.

73. The Defendant knowingly gave her husband, John Park, a signed blank check on her sole bank account for him to utilize in his discretion in the process involving the disposition of the net proceeds arising from the sale of the Sachse Store.

74. There is no evidence to suggest that the Defendant took any action that could be reasonably interpreted as contradicting the impression that her husband, John Park, had full authority to act on her behalf in the sale of the Sachse Store and the disposition of its realized proceeds.

75. The circumstances under which the Defendant's husband, John Park, pervasively controlled the business interests nominally held in the name of the Defendant would lead a reasonably prudent person to believe that John Park possessed the authority that he was purporting to exercise.

76. Even if one were to accept (which this Court does not) that the Defendant did not have actual knowledge of the fraudulent actions taken by her husband-agent in the disposition of the net proceeds arising from the sale of the Sachse Store, the Defendant subsequently ratified that fraudulent conduct.

77. The Defendant confirmed at trial that her prime motivation in seeking the sale of the Sachse Store was to recoup as much of her $500,000 investment in SSP Corp. as she could, notwithstanding the fact that the sale only netted approximately $400,000 — ostensibly to be divided among the two shareholders of this closely-held corporation.

78. The Defendant subsequently ratified the fraudulent conduct of her husband by personally implementing the "stop-payment"procedure at the Wells Fargo Bank, thereby fraudulently depriving Mr. Pak of the $75,000 good faith deposit toward the fulfillment of her legal obligation to tender to Mr. Pak his proportionate share of the net proceeds arising from the sale of the Sachse Store.

79. The Defendant subsequently ratified the fraudulent conduct of her husband by personally withdrawing all funds from her personal bank account at Wells Fargo Bank, including the $75,000 purportedly designated for Mr. Pak, as well as the remainder of the proportionate share of the net proceeds due and owing to Mr. Pak arising from the sale of the Sachse Store.

80. The Defendant subsequently ratified the fraudulent conduct of her husband and

knowingly gained the benefits of her husband's fraudulent conduct by unlawfully retaining the proportionate share of the net proceeds due and owing to Mr. Pak arising from the sale of the Sachse Store.

81.     The Defendant knowingly obtained the benefits of her husband's fraudulent conduct by unlawfully retaining the proportionate share of the net proceeds due and owing to Mr. Pak arising from the sale of the Sachse Store after acquiring full knowledge of his fraudulent deeds.

82.     Mr. Pak failed to tender any specific factual findings made by the jury in the State Court Litigation.

83.     Mr. Pak failed to tender the record of the state court proceeding from which the specific factual findings might otherwise have been discerned.

84.     Though, in the absence of the prior State Court Litigation, Mr. Pak might have otherwise been entitled to recover in this action his proportionate share (49%) of the $396,507.58 of net proceeds arising from the sale of the Sachse Store for the fraud perpetrated by the Defendant, he is instead bound by the liquidated amount of the debt [$103,407.36] found to have arisen by the Defendant's fraud as established by the State Court Judgment.

85.     Plaintiff, Sok San Pak, has failed to demonstrate by a preponderance of the evidence that a debt is owed to him by the Defendant arising from Kim & Pak Corp. and the failure to proceed with the development of a business in Prosper.

86.     Plaintiff, Sok San Pak, has failed to demonstrate by a preponderance of the evidence that the Defendant acted in a fiduciary capacity as to him at any time.

87.     Plaintiff, Sok San Pak, has failed to demonstrate by a preponderance of the evidence that a trust relationship existed between the Defendant and himself prior to the creation of any indebtedness between the parties.

88.     Plaintiff, Sok San Pak, has failed to present any evidence to demonstrate the reasonable and necessary nature of any additional attorney's fees incurred in this adversary proceeding.

89.     To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

## *CONCLUSIONS OF LAW*

1.     The Court has jurisdiction to consider the adversary complaint in this proceeding pursuant to 28 U.S.C. §§1334 and §157.

2.     This Court has authority to enter a final judgment in this adversary proceeding since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(I) and (O) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

3.     In an action to determine the dischargeability of a debt, the creditor has the burden of proof under a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

4.     "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011) (citing *Hudson v. Raggio & Raggio, Inc. (In re Hudson)),* 107 F.3d 355, 356 (5th Cir. 1997).

5.     The fact that there is a debt owing by the Defendant to Plaintiff, Sok San Pak, is established through the final judgment issued in the State Court Litigation. However, this Court retains exclusive jurisdiction to determine whether any portion of that debt is dischargeable. *Grogan v. Garner*, 498 U.S. 279, 285, n.11, (1991); *Fielder v. King (Matter of King),* 103 F.3d 17, 19 (5th Cir. 1997).

*Collateral Estoppel*

6.     "Collateral Estoppel or, in modern usage, issue preclusion, 'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" *Schiro v. Farley*, 510 U.S. 222, 232 (1994) (internal quotations omitted).

7.     In other words, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. U. S.*, 440 U.S. 147, 153 (1979) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5 (1979)).

-12-

8.      "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Id.* at 153-54.

9.      In the bankruptcy dischargeability context, "parties may invoke collateral estoppel in certain circumstances to bar re-litigation of issues relevant to dischargeability" and satisfy the elements thereof. *Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264 (5th Cir. 2005) (quotation marks omitted).

10.     In other words, when an issue that forms the basis for the creditor's theory of non-dischargeability has been actually litigated in a prior proceeding, neither the creditor nor the debtor may re-litigate those grounds. *RecoverEdge, L.P. v. Pentecost,* 44 F.3d 1284, 1294 (5th Cir. 1995).

11.     While the doctrine of issue preclusion applies in bankruptcy dischargeability litigation, a bankruptcy court retains exclusive jurisdiction to determine whether a debt is dischargeable. *Grogan v. Garner*, 498 U.S. 279, 284 n. 11 (1991).

12.     The inquiry into the preclusive effect of a state court judgment is guided by the full faith and credit statute, which states that "judicial proceedings . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." 28 U.S.C. §1738 (1994).

13.     Thus, federal courts look to the principles of issue preclusion utilized by the forum state in which the prior judgment was entered. *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 181 (5th Cir. 1997).

14.     Because the judgment against the Defendant was entered in a Texas state court, this Court applies the Texas law of issue preclusion. *Pancake v. Reliance Ins. Co. (In re Pancake)*, 106 F.3d 1242, 1244 (5th Cir. 1997); *Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195 (5th Cir. 1996).

15.     The doctrine of collateral estoppel (issue preclusion) "is designed to promote judicial efficiency, protect parties from multiple lawsuits, and prevent inconsistent judgments by precluding the relitigation of any ultimate issue of fact actually litigated and essential to the judgment in a prior suit." *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 801 (Tex.1994); *Tarter v. Metropolitan Sav. & Loan*

*Ass'n*, 744 S.W.2d 926, 927 (Tex.1988).

16. "The doctrine applies when the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit." *Eagle Properties, Ltd., v. Scharbauer*, 807 S.W.2d 714, 721 (Tex. 1991); *Texas Dept. of Public Safety v. Petta*, 44 S.W.3d 575, 579 (Tex. 2001).

17. Specifically, a party is collaterally estopped from raising an issue under Texas law when: (1) the facts sought to be litigated in the second case were fully and fairly litigated in the first; (2) those facts were essential to the prior judgment; and (3) the parties were cast as adversaries in the first case. *Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 818 (Tex. 1984); *MGA Ins. Co. v. Charles R. Chesnutt, P.C.*, 358 S.W.3d 808, 817 (Tex. App. – Dallas 2012, no pet.).

18. "Once an actually litigated and essential issue is determined, that issue is conclusive in a subsequent action between the same parties." *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 384 (Tex. 1985).

19. For the purposes of collateral estoppel under Texas law, an issue was "actually litigated" when it was properly raised, by the pleadings or otherwise, and it was submitted for determination, and determined. *Id.*, citing RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. d (1982); *In re Calderon*, 96 S.W.3d 711, 721 (Tex. App. – Tyler 2003, orig. proceeding).

20. In the context of issue preclusion, "issue" and "fact" are interchangeable. The purpose of the reviewing court is to determine the specific facts brought that were already established through full and fair litigation.

21. As stated in the Fifth Circuit decision in *Fielder v. King (Matter of King),* 103 F.3d 17, 19 (5th Cir. 1997):

> Issue preclusion will prevent a bankruptcy court from determining dischargeability issues for itself only if 'the first court has made *specific, subordinate, factual findings* on the identical dischargeability issue in question . . . and the facts supporting the court's findings are discernible from that court's record."], *citing Dennis v. Dennis (Matter of Dennis),* 25 F.3d 274, 278 (5th Cir. 1994) ["Collateral estoppel applies in bankruptcy courts only if, inter alia, the first court has made . . . factual findings on the identical dischargeability

> issue in question – that is, an issue which encompasses the
> same prima facie elements as the bankruptcy issue."]
> (emphasis added).

22.     While separate and distinct findings of fact by a state trial court are preferable,
        factual findings need not be explicitly stated nor separately denominated in order
        for collateral estoppel principles to apply.

23.     In the event that the state court judgment is conclusory and does not contain
        detailed facts sufficient as findings to meet the federal test of non-dischargeability,
        the court may also examine the evidence produced in the state court proceedings to
        support the judgment and determine whether the record of the state court
        proceedings is sufficient to discern the subsidiary facts supporting the judgment.
        *Simpson & Co. v. Shuler (In re Shuler)*, 722 F.2d 1253, 1257-58 (5th Cir. 1984);
        *Sierra Inv. Assoc. v. Tomlin (In re Tomlin)*, 2005 WL 6440629, at *5 (Bankr. N.D.
        Tex., Dec. 20, 2005) (*citing Dennis*, 25 F.3d at 278).

24.     In other words, collateral estoppel under Texas law may be properly applied "with
        realism and rationality" through an examination of the state court proceeding to
        discern the subsidiary facts "necessarily decided" to reach a judgment in the first
        proceeding and which are germane to a determination of non-dischargeability
        under the Bankruptcy Code.  *See, e.g., Fort Worth Hotel, L.P. v. Enserch Corp.*,
        977 S.W.2d 746, 753-54 (Tex. App. – Fort Worth 2003, no pet.) [collateral
        estoppel properly applied to establish negligence of defendant even though
        factfinder did not make any specific finding that a particular act or omission
        caused an explosion].

25.     As the party asserting the preclusive effect of the findings arising from the State
        Court Litigation, the Plaintiffs have the burden of proof on all elements of
        collateral estoppel.

26.     Under Texas law, "a judgment is something more than the findings of fact in the
        controversy, or even a recommendation as to the future course of the parties
        litigant; that it is the solemn sentence of law pronounced by the court on the facts
        found. A judgment is the final consideration and determination of a court of
        competent jurisdiction on the matters submitted to it."  *Speer v. Stover*, 711
        S.W.2d 730, 734 (Tex. App. – San Antonio 1986, no writ).[20]

---

[20] *Speer* also stands for the proposition that a Texas judgment is not to be interpreted in the light
of subsequent or prior statements or acts of the court evincing judicial intention when the judgment was

27.  The only facts established by the Plaintiffs under the principles of collateral estoppel are those recited in the State Court Judgment which evidence that fraud issues were necessarily submitted for determination, accordingly determined, and essential to that judgment.

*Nondischargeability Under 523(a)(2)(A):  Debt Arising
by Fraud, False Pretenses, or False Representation*.

28.  The Plaintiffs' Complaint seeks a determination that the debt owed to each of them should be excepted from discharge under §523(a)(2)(A) as a debt obtained by false pretenses, a false representation or actual fraud.

29.  11 U.S.C. §523(a)(2)(A) of the Bankruptcy Code provides that:

> a discharge under §727 of this title does not discharge an individual debtor from any debt for money, property, or services, . . . to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

30.  Section 523(a)(2)(A) encompasses similar but distinct causes of action.  Though other circuits have applied a uniform standard to all § 523(a)(2)(A) actions,[21] the Fifth Circuit has distinguished the elements of "actual fraud" and of "false

---

rendered. Thus, subsequent findings issued 35 days after the judgment were ignored and found to constitute no part of the earlier-issued judgment.

[21]  *See, e.g., Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987).  Though some bankruptcy courts outside of the Fifth Circuit have cited the decision of the United States Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351(1995), in support of their proposition that all of the §523(a)(2)(A) actions are governed by the elements for actual fraud, *see, e.g., AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr. W.D. Mo. 1997); *AT& T Universal Card Services v. Alvi (In re Alvi)*, 191 B.R. 724 (Bankr. N.D. Ill. 1996); the Supreme Court in that case was actually distinguishing the language used in §523(a)(2)(A) from that utilized in §523(a)(2)(B) in order to determine the degree of reliance necessary above mere reliance in fact in order to exempt a debt from discharge under (a)(2)(A).  Since the Supreme Court specifically refused to even apply their direct holding regarding the degree of  reliance in actual fraud cases to cases of false pretense or false representation, 116 S.Ct. at 443, n. 8, the statement that the Court erased all distinctions between the three (a)(2)(A) actions strains credibility.

pretenses and false representations." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995).

31.    The distinction recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event, as opposed to a representation regarding a past or existing fact. *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir.1991) [A debtor's promise ... related to a future action which does not purport to depict current or past fact ... therefore cannot be defined as a false representation or a false pretense].[22]

32.    Because any representation by John Park, as an agent of the Defendant, regarding the future disposition of net proceeds arising from the sale of the Sachse Store pertained to a future event, any such statement cannot be properly characterized as a false representation or a false pretense in this Circuit.

33.    Thus, the validity of the claim of Mr. Pak under §523(a)(2)(A) in this case rests upon sufficient proof that the debt was obtained by actual fraud.

34.    To have a debt excepted from discharge pursuant to the "actual fraud" provision in § 523(a)(2)(A), an objecting creditor must prove that:
       (1) the debtor made representations;
       (2) at the time they were made the debtor knew they were false;
       (3) the debtor made the representations with the intention and purpose to deceive the creditor;
       (4) the creditor justifiably relied on such representation; and
       (5) the creditor sustained losses as a proximate result of the representations.

*Pentecost*, 44 F.3d at 1293, *as modified by the United States Supreme Court decision of Field v. Mans*, 516 U.S. 59 (1995) [regarding the proper standard of reliance].

---

[22] While "false pretenses" and "false representation" both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement. *See Walker v. Davis (In re Davis)*, 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007); and *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003). In order for a debtor's representation to constitute a false pretense or a false representation, it "must have been: (1) [a] knowing and fraudulent falsehood, (2) describing past or current facts, (3) that [was] relied upon by the other party." *In re Allison*, 960 F.2d at 483; *see also In re Bercier*, 934 F.2d at 692 ["to be a false representation or false pretense under § 523(a)(2), the false representations and false pretenses must encompass statements that falsely purport to depict current or past facts"].

35.   As to the Defendant, a debt may be determined to be non-dischargeable for fraud based upon a spouse's fraudulent conduct when imputed under agency principles based upon a business relationship between the spouses. *Tummel & Carroll v. Quinlivan (In re Quinlivan)* 434 F.3d 314, 318 (5th Cir. 2005); *Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277, 1282 (5th Cir. 1992).[23]

36.   The imputation of fraud for §523(a) nondischargeability purposes may be appropriate, notwithstanding the fact that a debtor-defendant may not have consented to the fraudulent acts, nor even had any knowledge or involvement in the fraud. *Id*. [referencing *Strang v. Bradner*, 114 U.S. 555, 561 (1885)].

37.   "The test under section 523(a)(2)(A), however, is not whether the debtor actually procured the money, property, services or credit for him or herself. Rather, the Code dictates that a particular debt is nondischargeable if the debtor benefits in some way from the money, property, services or credit obtained through deception." *Id.* at 1283 (citations and internal quotations omitted).

38.   As the Fifth Circuit stated in *Quinlivan*,

>      Section 523(a)(2)(A) is not designed to protect debtors; rather it is designed to protect the victims of fraud. Holding the debtor accountable for his partner's [or agent's] fraud effectuates important state law policies regarding imputed liability. These state law policies create incentives for the debtor to control or monitor the conduct of his agent or partner. Even if the partner [or principal] is innocent of wrongdoing and had no knowledge or reason to know of the fraud, the debt is not dischargeable under §523(a)(2)(A).

434 F.3d at 319.

39.   "This circuit imputes fraud to debtors only if the fraudulent representations were made by a formal partner or agent. The relationship between the parties is analyzed under state law." *Id.*

40.   Under Texas law, "[a]n agent's authority to act on behalf of a principal depends on some communication by the principal either to the agent (actual or express

---

[23]   However, it is true that any fraud perpetrated by one spouse cannot be properly imputed to the other spouse based *solely* upon the existence of a marital relationship. *Tower Credit, Inc. v. Gauthier (In re Gauthier)*, 349 Fed. App'x. 943, 945 (5th Cir. 2009).

authority) or to the third party (apparent or implied authority)." *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007).

41.     "Apparent authority . . . is based on estoppel, arising either from a principal knowingly permitting an agent to hold himself out as having authority or by a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority he purports to exercise." *Id.*, *quoting Baptist Mem. Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948 (Tex. 1998).

42.     Further, "[w]hether or not an agent is initially authorized to act on behalf of a principal, the agent's actions may be attributed to a principal . . . if the principal later ratifies the agent's conduct." *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 552 (Tex. App. – Houston [14th Dist.] 2003, no pet.).

43.     As one court noted,

> Ratification is the affirmance by a person of a prior act which when performed did not bind him, but which was professedly done on his account, whereby the act is given effect as if originally authorized by him.  Ratification, in this context, is not a form of authorization, but a legal concept in agency law describing the relations between parties after affirmance by a person of a transaction done or purported to be done for him.

*Disney Enters., Inc. v. Esprit Fin., Inc.*, 981 S.W.2d 25, 30 (Tex. App. – San Antonio 1998, pet. dism'd w.o.j.), citing RESTATEMENT (SECOND) OF AGENCY §82 (1958).

44.     "A ratification will lie when the individual for whom an act was done retains the benefits of the transaction after acquiring full knowledge of the transaction." *Id.*

45.     While a ratification of a fraudulent act through retention of its benefits is not a form of agency authorization, its existence is sufficient to draw a debt within the scope of nondischargeability under §523(a)(2)(A) as a debt obtained by fraud because, after the ratification of the fraudulent act, the debtor benefits from the money "obtained through deception." *Luce*, 960 F.2d at 1283.

46.     Thus, the portion of the debt owed by the Defendant, Bo Kyoung Kim, to the Plaintiff, Sok San Pak, which is comprised of compensatory damages for fraud in the amount of $103,407.36, plus all pre-judgment and post-judgment interest

thereon, as established by the State Court Judgment, is therefore excepted from discharge as a debt obtained by actual fraud pursuant to 11 U.S.C. §523(a)(2)(A).

*Nondischargeability under § 523(a)(4)*:  *Debt Arising*
*From Fraud or Defalcation in a Fiduciary Capacity*.

47.    11 U.S.C. §523(a)(4) provides that "A discharge under 11 U.S.C.§ 727 does not discharge an individual from a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."

48.    The Fifth Circuit has noted "that this discharge exception was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's."  *Miller v. J.D. Abrams Inc. (Matter of Miller),* 156 F.3d 598, 602 (5th Cir.1998), *cert. denied*, 526 U.S. 1016 (1999) (internal quotations omitted).

49.    Whether the actions of an individual were taken in a fiduciary capacity for the purposes of §523(a)(4) is determined by federal law.  *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 620 (5th Cir. 2011).

50.    However, "state law is important in determining whether or not a trust obligation exists."  *Gupta v. Eastern Idaho Tumor Institute, Inc. (In re Gupta)*, 394 F.3d 347, 350 (5th Cir. 2004).

51.    The Fifth Circuit has discussed the concept of a fiduciary under §523(a)(4) in the following terms:

> [T]he concept of fiduciary under §523(a)(4) is narrower than it is under general common law.  Under §523(a)(4), "fiduciary" is limited to instances involving express or technical trusts.  The purported trustee's duties must, therefore, arise independent of any contractual obligation. The trustee's obligations, moreover, must have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong.  Constructive trusts or trusts *ex malificio* thus also fall short of the requirements of §523(a)(4).

**-20-**

> . . . Statutory trusts, by contrast, can satisfy the dictates of §523(a)(4).  It is not enough, however, that a statute purports to create a trust:  A state cannot magically transform ordinary agents, contractors, or sellers into fiduciaries by the simple incantation of the terms "trust" or "fiduciary."  Rather, to meet the requirements of §523(a)(4), a statutory trust must (1) include a definable res and (2) impose "trust-like" duties.

*Texas Lottery Comm'n v. Tran (In re Tran),* 151 F.3d 339, 342-43 (5th Cir. 1998).

52.    However, the trust relationship must exist prior to the creation of, and without reference to, the indebtedness in question.  *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1338 (5th Cir. 1980).

53.    The Fifth Circuit has recognized that the "technical" or "express" trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law.  *FNFS, Ltd. v. Harwood (In re Harwood)*, 404 B.R. 366, 393 (Bankr. E.D. Tex. 2009) (citing *LSP Inv. Partnership v. Bennett (In re Bennett)*, 898 F.2d 779, 784-85 (5th Cir.), *cert. denied*, 510 U.S. 1011 (1993)).

54.    Federal courts in this context have "not hesitated to conclude that debts arising from misappropriation by persons serving in a traditional, pre-existing fiduciary capacity, as understood by state law principles, are non-dischargeable."  *Shcolnik v. Rapid Settlements, Ltd. (In re Shcolnik)*, 670 F.3d 624, 628 (5th Cir. 2012) (citing *Gupta*, 394 F.3d at 350).

55.    Texas law does not recognize a fiduciary relationship existing as a matter of law between majority and minority shareholders in closely-held companies. *See Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 391 (Tex. App. – Houston [1st Dist.] 2012, pet. filed); *Vejara v. Levior Intern., LLC,* 2012 WL 5354681, at *4 (Tex. App.– San Antonio, Oct. 31, 2012, pet. denied); *Redmon v. Griffith*, 202 S.W.3d 225, 237 (Tex. App.– Tyler 2006, pet. denied).

56.    Such a fiduciary relationship between individual shareholders will not exist unless some other special relationship exists between them in addition to the corporate relationship.  *Id.; Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 389 (Tex.App.-Houston [1st Dist.] 2012, pet. granted, judgm't set aside, remanded by agr.); *Harris v. Mack*, 2012 WL 6970540, at * 3 (W.D. Tex., Dec. 5, 2012).

57.   The Defendant did not stand in a fiduciary relationship as to Mr. Pak that is sufficient to meet the fiduciary capacity requirement under 11 U.S.C. §523(a)(4).

58.   Because the Court concludes that Plaintiff, Soo Kyoung Pak, has failed to demonstrate by a preponderance of the evidence that any debt is owed to her by the Defendant or that the Defendant acted in any fiduciary capacity in regard to her, judgment must be rendered for the Defendant on her §523(a)(4) claim.

59.   Because the Court concludes that Plaintiff, Sok San Pak, has failed to demonstrate by a preponderance of the evidence that any debt owed to him by the Defendant arose while the Defendant was acting in a fiduciary capacity as to him, judgment must be rendered for the Defendant on his §523(a)(4) claim.


*Attorney's Fees, Interest, and Exemplary Damages.*

60.   With regard to non-dischargeability of attorney's fees and accrued interest, "the status of ancillary obligations such as attorney's fees and interest depends on that of the primary debt.  When the primary debt is nondischargeable ..., the attorney's fees and interest accompanying compensatory damages, including post-judgment interest, are likewise nondischargeable." *Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1208 (5th Cir. 1996); see also *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998).

61.   The award of reasonable and necessary attorney's fees to Mr. Pak and against the Defendant in the amount of $50,000.00 as set forth in the State Court Judgment is rendered non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A).

62.   "As a general rule, a party seeking to recover attorney's fees [under Texas law] carries the burden of proof.  Although courts should consider several factors when awarding attorney's fees, a short hand version of these considerations is that the trial court may award those fees that are "reasonable and necessary" for the prosecution of the suit."  *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex.1991).

63.   The failure of Mr. Pak to present actual evidence of any attorney's fees incurred, and to demonstrate the reasonable and necessary nature of such fees, precludes the recovery of attorney's fees otherwise incurred in the prosecution of this adversary proceeding.

64.     The United States Supreme Court has stated that "[o]nce it is established that specific money or property has been obtained by fraud, . . . 'any debt' arising therefrom is excepted from discharge." *Cohen,* 523 U.S. at 218; *see also Snook v. Popiel (In re Snook)*, 168 Fed. App'x. 577, 578 (5th Cir. 2006); *S&S Food Corp. v. Sherali (In re Sharali)*, 490 B.R. 104, 125 (Bankr. N.D. Tex. 2013).

65.     While Mr. Pak did not present the precise jury findings with regard to the award of exemplary damages, the State Court Judgment specifies that the award is "for exemplary damages by committing fraud."

66.     Notwithstanding the lack of distinct factual findings, the state court could not have authorized, as it clearly did, the recovery of exemplary damages by Mr. Pak for the fraudulent representations by the Defendant.  *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986) ["To support an award of exemplary damages, the plaintiff must prove a distinct tortious injury with actual damages."].

67.     Indeed, it is irrefutable that the state court not only found that Mr. Pak had proven his fraud claims against the Defendant, but that he had proven the validity of those fraud claims by clear and convincing evidence – as that is the requisite evidentiary standard for recovery of exemplary damages resulting from fraud under Texas law. *Citizens Nat'l Bank v. Allen Rae Invs.*, 142 S.W.3d 459, 484 (Tex. App. – Fort Worth 2004, no pet.); 2A TEX. CIV. PRAC. & REM. CODE ANN. §41.003(a)(1) (Vernon Supp. 2012).

68.     Because the United States Supreme Court has clearly stated that §523(a)(2)(A) should be construed to bar the discharge of all liability arising from fraud, thereby insuring "that the creditors' interest in recovering full payment of debts in these categories outweigh[s] the debtors' interest in a complete fresh start," the Court concludes that the exemplary damage award of $310,222.08 rendered to Mr. Pak based upon the Defendant's fraud as set forth in the State Court Judgment should also be rendered non-dischargeable under §523(a)(2)(A).[24]

69.     Court costs of $293.00 are awarded to Mr. Pak to be paid by the Defendant.

---

[24]  The determination of non-dischargeability of the existing exemplary damage award in the State Court Judgment is appropriate at this time, even though that portion of the State Court Judgment may still be subject to appellate review and subsequently reversed and/or revised.

## *CONCLUSION*

70.     Thus, the portion of the debt owed by the Defendant, Bo Kyoung Kim, to the Plaintiff, Sok San Pak, comprised of compensatory damages for fraud in the amount of $103,407.36, plus pre-judgment and post-judgment interest thereon, plus the exemplary damage award of $310,222.08, plus the award of attorney's fees in the amount of $50,000.00, all as established by the State Court Judgment, plus court costs awarded in this action in the amount of $293.00, is therefore excepted from discharge pursuant to 11 U.S.C. §523(a)(2)(A).

71.     All other relief requested in the Plaintiffs' Complaint in the above-referenced adversary proceeding, including all relief requested by Plaintiff, Soo Kyoung Pak, shall be denied.

72.     To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

73.     An appropriate judgment shall be entered consistent with these findings and conclusions.

Signed on 09/25/2013

THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE